GUARDIAN STATE BANK AND TRUST CO., PERSONAL REPRESENTATIVE OF THE ESTATE OF MARJORIE SHEPARD, DECEASED, APPELLANT AND CROSS-APPELLEE, V. MYRON JOHN JACOBSON, APPELLEE AND CROSS-APPELLANT, JOHN JACOBSON ET AL., INTERVENORS-APPELLANTS AND CROSS-APPELLEES.

369 N.W.2d 80

Filed June 14, 1985.   No. 84-284.

Laurice M. Margheim of Bayer & Margheim, for appellant.

Robert G. Simmons, Jr., of Wright, Simmons & Selzer, for appellee.

James R. Wefso of Hollstein & Wefso, and Patrick M. Connealy, for intervenors-appellants.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

BOSLAUGH, J.

The Guardian State Bank and Trust Co., as the personal representative of the estate of Marjorie Shepard, deceased, commenced this action to recover amounts loaned or advanced to the defendant, Myron John Jacobson, by the deceased in her lifetime, and rent due her from the defendant for the years 1979 through 1982. The petition sought an accounting and a judgment for the amount due.

The case was submitted to the jury upon a form of special verdict. The jury found that the decedent had loaned the defendant $77,527.89 and had advanced $26,207.85 to the defendant but that these debts had been forgiven. The jury further found that rent in the amount of $2,100 per year was due for each of the years 1979 through 1982. Judgment was entered for the plaintiff in the amount of $8,400. Later, the trial court added prejudgment interest in the amount of $2,340.60 to the judgment. The plaintiff and several heirs of the deceased who intervened in the action have appealed. The defendant has cross-appealed.

The defendant has paid the judgment for the rent due the plaintiff. This appeal concerns only the loans and advances and the issue of prejudgment interest.

The record shows that Marjorie Shepard died testate on October 24, 1982, domiciled in South Dakota but owning

property in Nebraska. She left 15 heirs. During her lifetime, she was aware of financial difficulties of the defendant. Beginning in June of 1980, the decedent wrote 23 checks to the defendant or his creditors. A number of the checks were written to the defendant and marked "loan," while others were made payable directly to the defendant's creditors to cover specific debts. The checks varied in amount and purpose, the largest being a check dated October 14, 1981, to the order of Myron Jacobson for $70,000 and marked "Loan" in the lower left-hand corner; the defendant endorsed this check to the First National Bank in order to forestall foreclosure on his cattle herd. The defendant testified that he never asked the deceased for this money, nor did she ever request a note from him in return; rather, the check was marked "Loan" per his instructions. According to the defendant, there was never any discussion as to whether or how any of the loans were to be repaid. The defendant further testified, over objection, that the last time he mentioned the loans to the deceased she replied, "I want you to stop talking about those as loans. I want you to forget it, and don't talk about it no more."

The defendant's sons, Douglas, Merlyn, and Michael Jacobson, also testified, over objection, as to conversations with the deceased concerning the loans. Douglas Jacobson testified to overhearing a conversation between the deceased and the defendant in which the deceased said "[t]hat he didn't owe her nothing." Merlyn Jacobson testified concerning another conversation between the deceased and the defendant in which the deceased said "that she didn't want him to worry about the money." The defendant's son Michael Jacobson testified to a conversation he had with the deceased in which he stated: " 'Marjorie, I am concerned how we're going to pay back this money.' And she said, 'Just don't worry about it. Just forget about it.' " Lastly, the defendant's wife testified, over objection, that the decedent told the defendant to "[f]orget about the money he owes." There was no testimony contradicting the fact or content of these conversations or denying that the deceased was concerned for the defendant's financial welfare.

The appellants contend that delivery of a written document

of some nature is necessary in order to forgive a debt which itself is not evidenced by a writing and that they were misled by the pretrial order of the trial court which established this as a rule of law to govern the trial.

The pretrial order merely stated that the defendant had the burden of proof on the issue of forgiveness. The standard of proof to be required on this issue was not determined, and the parties were ordered to submit briefs as to that matter.

In a letter to counsel, sometime later, the trial court stated, "I intend to rule on the burden of proof on Issue nine [forgiveness] and to let you know what I have determined to be the law on certain other matters." In the rest of the letter there is a discussion of the question of whether written evidence of forgiveness is required and a statement that " 'the evidence of a donating [sic] intent must be clear and unmistakable and inconsistent with any other theory.' " The last sentence of the letter, which follows the above quotation, states: "I will probably instruct the jury to that effect."

While the writing of such letters is a practice that should be discouraged because of the opportunity for confusion and misunderstanding, we do not believe the record supports the contention of the appellants that the trial court had established the necessity of written evidence of forgiveness or a rule of law to govern the trial. Although the letter states that it was written as "an addition to the report of the pre-trial conference," it does not establish the defendant's burden of proof as contended by the plaintiff. It was by no means definitive and did not establish that forgiveness could be proved only by a writing.

The appellants' contention that written evidence is required, if accepted, would amount to establishing a judicial "statute of frauds." This is an area that traditionally has been left to legislation. Although authority in other jurisdictions can be found which supports the contention of the appellants, we do not choose to follow those decisions. Such a rule has never been adopted in Nebraska.

In *In re Estate of Scott*, 148 Neb. 182, 26 N.W.2d 799 (1947), one of the questions before the court was whether the deceased, during her lifetime, had made a gift of a federal farm mortgage bond to the plaintiff. This court stated:

It is generally true that delivery is essential to constitute a gift inter vivos. Ordinarily actual delivery is necessary where the subject of the gift is capable of manual delivery, but where actual manual delivery cannot be made, the donor may do that which, under the circumstances, will in reason be considered equivalent to actual delivery.

*Id.* at 187, 26 N.W.2d at 801-02.

In *In re Estate of Saathoff. Saathoff v. Saathoff,* 206 Neb. 793, 801, 295 N.W.2d 290, 296 (1980), this court set forth:

"To make a valid and effective gift inter vivos, there must be an intention to transfer title to the property, and a delivery by the donor and acceptance by the donee." [Citation omitted.] . . . "The essential elements of a gift inter vivos are donative intent, delivery, and acceptance. Once it is ascertained that it was the intention of the donor to make a gift inter vivos of an undivided interest in a chattel or chose in action, and all is done under the circumstances which is possible in the matter of delivery, the gift will be sustained. . . ." [Citation omitted.]

*Rorabaugh v. Garvis,* 198 Neb. 223, 226, 252 N.W.2d 161, 163 (1977), which was cited in the *Saathoff* case, continued: " 'In such cases, the delivery may be symbolical or constructive if as nearly perfect and complete as the nature of the property and the attendant circumstances will permit.' " See, also, *In re Estate of Scott, supra.*

*Rorabaugh* and *White v. Bank of America,* 53 Cal. App. 2d 831, 128 P.2d 600 (1942), which was cited in *Rorabaugh,* although not factually similar, are significant because of the rationale used to sustain the gifts therein. In both cases, deceased persons, while living, had intended to make gifts of a joint interest in bank accounts, but the essential paperwork was not completed before the donors' deaths. Quoting *White* in *Rorabaugh,* this court said: " 'When the clear intention of the donor to make a gift can be carried out without doing violence to the established principles of law the courts should not seek highly technical reasons for defeating the gift.' " 198 Neb. at 227, 252 N.W.2d at 164.

In *Dinslage v. Stratman,* 105 Neb. 274, 180 N.W. 81 (1920), the administrator of the deceased's estate brought an action to

recover $1,400 which the deceased had loaned to her son during her lifetime. The defendant admitted that he had been indebted to the deceased but stated that he had paid the money, at her direction, to the deceased's granddaughter as a gift.

In the *Dinslage* case none of the indebtedness was evidenced by a note or other writing. The deceased had, in her lifetime, promised to give her granddaughter $1,000, under certain conditions, and had instructed the defendant to pay the $1,000. As this court stated in outlining the facts: "Thus it will be seen that . . . [the deceased] did everything in her power to make final disposition of the chose in action arising from her loans of money to her son . . . ." *Id*. at 276, 180 N.W. at 82.

In holding that a valid gift to the granddaughter had been made, this court said at 280, 180 N.W. at 83:

> In the instant case, there was no promissory note or other documentary evidence of the $1,400 debt, and consequently there was nothing tangible that could be delivered by Thresa Stratman to any one. The whole thing rested in parol. The only thing that could be done by her was to direct her debtor to pay $1,000 of the money to Tracey, instead of to herself. It is conclusively established by the evidence that she gave this direction. Hence, she did everything in June, 1915, that was in her power to divest herself of the title to the chose in action, and invest Tracey with it. We think that there was a sufficient delivery. To hold otherwise would be to say that there can be no delivery of a chose in action unless it is accompained [sic] by delivery of written evidence of it, and this would be absurd:

The evidence in this case, if believed, was sufficient to prove a valid gift inter vivos and, thus, forgiveness of the indebtedness of the defendant.

The appellants contend that the testimony as to statements made by the deceased was hearsay and should not have been admitted.

In *Peters v. Wilks*, 151 Neb. 861, 866, 39 N.W.2d 793, 796 (1949), this court held, insofar as is relevant here, that "[d]eclarations of a deceased against interest are admissible . . . ." This is in accord with the general rule as expressed at 38 Am.

Jur. 2d *Gifts* § 98 at 899 (1968):

> While it often appears, in cases dealing with the admissibility of declarations by a donor subsequent to an alleged gift, on the issue as to the gift, that the donor had died before the time of the trial, such fact does not appear to affect the principles . . . involving the admission of such declarations when they were against his pecuniary interest or excluding them when they were merely self-serving declarations.

The statements in question were against the pecuniary interest of the deceased and were admissible as such.

The trial court awarded the plaintiff $2,340.60 as prejudgment interest on the $8,400 due the plaintiff for use of the decedent's pastureland during her lifetime. The defendant has cross-appealed from the award of prejudgment interest.

The rule in this jurisdiction was stated recently in *Jeffres v. Countryside Homes, ante* p. 26, 31, 367 N.W.2d 728, 732 (1985): " '[W]here a reasonable controversy exists as to the plaintiff's right to recover or as to the amount of such recovery, the claim is generally considered to be unliquidated and prejudgment interest is not allowed.' *Slusarski v. American Confinement Sys.*, 218 Neb. 576, 582, 357 N.W.2d 450, 455 (1984)."

The defendant testified that at one time he had paid the decedent and her husband (earlier deceased) $7 per month per cow-calf unit. The plaintiff's witness testified that the fair rental value of the grassland was $14 to $16 for a cow-calf unit, although it is unclear as to what time period this testimony referred. Since the rate was in dispute, the amount due was unliquidated. Prejudgment interest should not have been allowed.

The judgment awarding the plaintiff prejudgment interest is reversed; the judgment in all other respects is affirmed. The cause is remanded with directions to enter a judgment conforming to this opinion.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED WITH DIRECTIONS.